T.C. Memo. 1997-302

UNITED STATES TAX COURT

ESTATE OF CAROLYN W. HOLLAND, DECEASED,
JACK K. HOLLAND, LEWIS G. HOLLAND, SR., AND
BETTY H. KANN, EXECUTORS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 7397-94.                    Filed June 30, 1997.

<u>S. Jarvin Levison</u>, for petitioner.

<u>Clinton M. Fried</u>, for respondent.

MEMORANDUM OPINION

PARR, <u>Judge</u>:  Respondent determined a deficiency of $388,074
in the Federal estate tax of Carolyn W. Holland (decedent), who
died on November 25, 1989.  Respondent also determined an

accuracy-related penalty of $77,615 pursuant to section 6662.[1]

After concessions,[2] the issues for decision are: (1) Whether decedent transferred the life estate she held in a house when she attempted to convey fractional fee simple interests to her children as gifts in 1984, 1985, and 1986. We hold she did. (2) Whether the 12 $10,000 annual gifts decedent made in each of the years 1985 through 1988 were transfers of present interests that qualify for the exclusion under section 2503(b). We hold they are completed transfers of present interests that may be excluded from decedent's taxable gifts, as set out below. (3) Whether 12 checks decedent wrote and delivered to her agent 4 days before she died were completed gifts, or in the alternative claims against the estate that may be deducted under section 2053(a)(3). We hold they are neither completed gifts nor claims against the estate. (4) Whether decedent had an enforceable, personal obligation to repay two transfers of $50,000 that she received from the J. Kurt Holland Residual Trust so that $100,000

---

[1]    All section references are to the Internal Revenue Code in effect as of the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

[2]    Petitioner deducted $61,081 on Schedule L, Form 706, as an expense of administering decedent's interest in a condominium. Prior to trial, petitioner conceded that $40,580 of these expenses were not allowable; the remaining amount, $20,501, is at issue.
    Respondent determined that the value of decedent's interest in the condominium at the date of her death was $500,000. Prior to trial, respondent conceded that the value was only $300,000.

may be deducted from the value of the gross estate under section 2053(a)(3). We hold she did not. (5) Whether the expense of 5 years of maid service may be deducted from the gross value of the estate as an administration expense pursuant to section 2053(a)(2). We hold it may not. (6) Whether petitioner is subject to an accuracy-related penalty under section 6662. We hold it is, to the extent set out below.

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.

Petitioner is the estate of Carolyn W. Holland (decedent), who died testate, on November 25, 1989, in Atlanta, Georgia (Atlanta). Lewis G. Holland, Sr. (Lewis), Betty H. Kann (Betty),[3] and Jack K. Holland (Jack) (the executors) are the executors of the estate. The executors had a mailing address in Atlanta at the time the petition in this case was filed. For convenience, we present a general background section and combine our findings of fact with our opinion under each separate issue heading.

A. General Background

Decedent

Decedent was born in Atlanta, on July 21, 1914. She was married to the late J. Kurt Holland (Holland), an attorney who practiced law in Atlanta. Decedent is survived by three

_____

[3] At the time of decedent's death, Betty Kann was known as Betty Koblitz.

children, Lewis, Betty, and Jack, and by eight grandchildren. Lewis and Betty each have three children, and Jack has two children.

### Jack Holland

Jack, the youngest son of decedent, is an attorney who formerly worked in the National Office of the Internal Revenue Service (IRS) in Washington, D.C., for 3 years. He has practiced law in Atlanta since 1973, and at the time of trial was a partner in the firm of Arnall Golden & Gregory. Jack's practice includes estate planning and general tax services.

Decedent gave Jack a power of attorney on May 21, 1982. Jack is a coexecutor of decedent's estate, and cotrustee for the Carolyn W. Holland Trust (the Carolyn Trust), the eight Weinstock Trusts created by decedent's mother for decedent's grandchildren, and the J. Kurt Holland Residual Trust (the JKH Trust). He is also the agent for decedent and each of the beneficiaries of the trusts.

On February 25, 1991, Jack, as one of the executors, filed a United States Estate (and Generation-Skipping Transfer) Tax Return (Form 706) with the Atlanta Service Center of the IRS.

### The Weinstock Property

Decedent's mother, Mrs. Paula M. Weinstock (Weinstock), owned approximately 50 acres of land (the Weinstock Property) between Roswell Road and Lake Forrest Drive in Fulton County, Georgia. Decedent's father, Jack Weinstock, operated a florist business on a portion of the property facing Roswell Road. On

another portion of the property, with access to Lake Forrest Drive, the Weinstocks built a house.

Weinstock sold approximately 2 acres of the Weinstock Property to Holland, where the Hollands built a house. Later, the Hollands gave a 1-acre portion of their property to their daughter, Betty Kann (then Koblitz), who built a house on her parcel.

Sometime during the 1950's the Weinstocks gave their home and approximately 11 acres to decedent's sister, Mrs. Nathan, which she used as a residence for her family. The Weinstocks then built a smaller residence on a different portion of the Weinstock Property (the Weinstock Residence).

The Weinstock Residence consisted of a house and 1.58 acres of land on Lake Forrest Drive. The executors of the Weinstock estate conveyed a life estate in the Weinstock Residence to decedent on August 10, 1984. Item IV of Weinstock's will provided that decedent had the right to sell in fee simple the Weinstock Residence; however, if she did not reinvest the proceeds in another home, the proceeds were required to be delivered to and held in trust by the trustees of the Carolyn Trust. The Carolyn Trust was created by Weinstock's will. If decedent did purchase another home with the proceeds of the sale of the Weinstock Residence, decedent's interest in the new home would continue in the same manner as it existed before such sale; that is, she would have a life estate in the new home.

Although decedent was devised a life estate in the Weinstock Residence, due to a careless reading of the will she believed that she had received a fee simple absolute. At the date of the devise, the fair market value of the property was $90,000, and decedent's life estate had a value of $54,470.[4]

On several occasions prior to 1980, Weinstock gave decedent and Mrs. Nathan undivided interests in the Weinstock Property. At the time of her death, on March 3, 1984, Weinstock owned 65 percent and decedent and Mrs. Nathan each owned 17 ½ percent of an undivided interest in approximately 28.75 acres of the Weinstock Property. Weinstock's interest in the 28.75 acres was devised in equal shares to two trusts created by her will, the Carolyn Trust and the Betty W. Nathan Trust (the Nathan Trust).

The Weinstock Trusts

On December 5, 1982, Weinstock created trusts for each of her 10 great-grandchildren (the Weinstock Trusts).[5] Each of the 10 trusts were identical except for the name of the beneficiary, and provided in relevant part:

> I. Additional Property. Either the Grantor or any person, with the consent of the Trustee, may add other properties to the trust hereby created by transferring such property to or making such insurance payable to the Trustee hereunder by deed, assignment, bequest or devise, and if so

---

[4] On Aug. 10, 1984, decedent was 70 years of age. The value of her life estate is calculated by multiplying the value of the property by 0.60522. Sec. 20.2031-7A(d)(6), Estate Tax Regs.

[5] Decedent had eight grandchildren, and Mrs. Nathan had two grandchildren.

added such property shall be covered by the provisions hereof the same as if originally hereunder.

II. <u>Dispositive Provisions</u>.  The Trustee shall hold, manage, invest and reinvest the assets of the trust, collect the rents, interest, dividends and other income therefrom, deduct the costs and expenses thereof and administer the trust as follows:

(a)  At any time and from time to time during each calendar year the Beneficiary may demand by written instrument delivered to the Trustee up to the value of any gifts transferred hereto during that year, payable by the Trustee upon receipt of demand made.  If the Beneficiary fails to exercise this right during any calendar year, this right as to that calendar year shall lapse and shall not be cumulative.  If the Beneficiary is a minor or otherwise is laboring under any legal disability, the Beneficiary's guardian, or if no guardian exists, the person having custody over such Beneficiary, shall be authorized but not required to make such written demand on behalf of the Beneficiary, and the property received pursuant to such written demand shall be held by the guardian or custodian for the benefit and use of such Beneficiary.

Whenever any transfer of property is made to the Trustee hereunder, the Trustee shall give immediate written notice of the withdrawal rights hereunder, and any such transfer, to the Beneficiary or, if the Beneficiary of Grantor is under legal disability, to his or her legal guardian or, in case no legal guardian has been appointed for the Beneficiary, to the person having custody of such Beneficiary.  The Beneficiary (or his guardian or custodian) may exercise the withdrawal right granted hereunder by delivering a written instrument to the Trustee at any time on or before the sixtieth (60th) day after receipt of notice from the Trustee, or the last day of such calendar year, whichever shall first occur.  The Trustee shall be authorized in satisfying any withdrawal right to distribute cash or other property of the trust.

<u>Issue 1.  Whether Decedent Transferred Her Life Estate in the Weinstock Residence When She Attempted To Give Fractional Fee Simple Interests to Her Children in 1984, 1985, and 1986</u>

<u>Transfers of the Weinstock Residence</u>

Decedent wanted to reduce her taxable estate and discussed with her family and her attorney various methods of doing so. Beginning in 1984, decedent decided to avail herself of the

annual exclusion from taxable gifts provided by section 2503(b) to make a series of annual gifts with a fair market value of $10,000 to each of her three children. After a discussion with her children, decedent agreed to transfer to each child, and each child agreed to accept, one-ninth of her interest in the Weinstock Residence in 1984, 1985, and 1986 (a transfer of one-ninth of her interest each year to each child).

In August 1984, due to an error in drafting the conveyance, decedent transferred by deed her entire interest in the Weinstock Residence to her three children. That is, decedent transferred nine-ninths of her interest, described in the deed as an interest in fee simple, instead of the three-ninths she intended to transfer. Unaware of the error, the transferees recorded this deed on January 22, 1985. Decedent executed deeds in 1985 and 1986 that purported in each of those years to convey an additional one-ninth of her interest to each child. The 1985 and 1986 deeds were not recorded by the children-transferees.

The Sale of the Weinstock Property

In May 1987, all of the parties owning interests in the Weinstock Property entered into an agreement to sell the entire Weinstock Property to a potential buyer (Purchaser). At the time of the agreement, the owners of the 28.75-acre portion, and their ownership percentages, were as follows: the Carolyn Trust, 32.5 percent, the Nathan Trust, 32.5 percent, decedent, 17.5 percent, and Mrs. Nathan, 17.5 percent. The remaining acreage was owned by decedent, individually, Mrs. Nathan, individually, and the JKH

Trust. In addition, Lewis, Betty, and Jack entered into the agreement as the owners of the Weinstock Residence.

Prior to closing, Purchaser performed a title search and discovered that Lewis, Betty, and Jack could convey no greater interest in the Weinstock Residence than a life estate pur autre vie, which was measured by the life of decedent. To quickly remedy the defect, and effect the sale, Lewis, Betty, and Jack conveyed their interests in the Weinstock Residence by quitclaim deed to the Carolyn Trust on July 23, 1987.

Due to reasons unrelated to the problem with the title to the Weinstock Residence, Purchaser did not purchase the entire Weinstock Property; instead it bought only the 28.75-acre portion for $6,000,000.

Shortly after Lewis, Betty, and Jack conveyed their interests in the Weinstock Residence to the Carolyn Trust, decedent transferred $90,000 to them. In the following year, on July 15, 1988, the remaining acreage of the Weinstock Property was sold to a different buyer. The JKH Trust sold its interest for $50,000, the Carolyn Trust sold the Weinstock Residence for $90,000, and decedent sold her residence on Lake Forrest Drive for $600,000.

Respondent determined that decedent made an unreported gift to Lewis, Betty, and Jack of her entire interest in the Weinstock Residence in 1984, or in the alternative, respondent asserted by an amendment to the answer, that the transfer in 1984 was void and that decedent made an unreported taxable gift of $90,000 to

the children "in some later year."  Petitioner asserts in its petition that decedent transferred one-ninth of her interest in the Weinstock Residence to each of the transferees in 1984, 1985, and 1986, and that in 1987 they conveyed by quitclaim deed their interests to the Carolyn Trust.[6]

The question before us is to what extent, if any, decedent made gifts of her interest in the Weinstock Residence in 1984, 1985, and 1986.  We must look to the law of Georgia, where the real property is located, for the answer to the problem thus posed.  Our determination in this regard should, according to the mandate of the Supreme Court of the United States in Commissioner v. Estate of Bosch, 387 U.S. 456 (1967), be predicated on State law, and the State's highest court is the best authority on its own law.  If there be no decision by that court then Federal authorities must apply what they find to be the State law after giving "proper regard" to relevant rulings of other courts of the State.  Id. at 465.

Under the law of Georgia, an executor of a will cannot convey a greater interest in property than what the terms of the will provide.  Ham v. Watkins, 181 S.E.2d 490, 492 (Ga. 1971).

_____

[6]     At trial, and in its reply brief, petitioner abandoned the position taken in its petition and argued that decedent's entire interest in the Weinstock Residence was transferred in 1984, and that the transfers by deed in 1985 and 1986 were "effectively meaningless."  In response to petitioner's argument, respondent argued that the 1984 transfer was a nullity, and the $90,000 transfer in 1987 was an unreported taxable gift.  Both parties thus appear to have abandoned their original positions and to have adopted instead continuously moving targets.

Nor can a life tenant convey any greater title than he or she may own. Mason v. Carter, 153 S.E.2d 162, 164 (Ga. 1967); Rigdon v. Cooper, 47 S.E.2d 633, 637 (Ga. 1948). Thus, it is clear that although decedent intended each year to transfer fractional fee simple interests in the Weinstock Residence, she could have conveyed no more than interests in her life estate.

The fact that decedent actually owned a lesser estate in the property than what she thought she was devised, and intended to transfer, does not invalidate the transfers. McDaniel v. Bagby, 51 S.E.2d 805, 809 (Ga. 1949) (should the holder of a life estate undertake to convey the entire estate in lands, he would simply convey his estate for life). Each year, decedent intended to give one-ninth of the entirety of her interest in the Weinstock Residence to each of her three children, and the children agreed to accept that amount. Decedent's transfers of fractional interests in a lesser estate than a fee simple absolute is not inconsistent with this intent.

Furthermore, the fact that the deed recorded in 1984 recited a greater estate in the property than what decedent actually owned does not void the transfer. A deed which conveys any estate in realty, if valid as to the estate conveyed, cannot be canceled in its entirety because the deed may be invalid as to some other estate sought to be conveyed therein. McDaniel v. Bagby, supra at 810; see also, McLemore v. Wilborn, 383 S.E.2d 892 (Ga. 1989) (delivery of otherwise valid deed is sufficient to sustain inter vivos gift of real estate); Rogers v. Pitchford,

184 S.E. 623, 624 (Ga. 1936) (the crucial test to determine whether deed conveys title to land is the intention of the parties, which is determined by looking at the whole deed).

Decedent, however, did not intend to convey nine-ninths of her interest in the property in 1984. Rather, the fact that she deeded additional fractional interests in 1985 and 1986 is clear and unequivocal evidence that she intended to convey three-ninths of her entire interest in each of the 3 years. See Dodge v. United States, 413 F.2d 1239, 1243 (5th Cir. 1969) (it is unnecessary to consider the reformation agreement as an operative instrument; its only function is the evidentiary one of supporting the factual finding that the transferor was mistaken).

Thus, the question for Federal gift tax purposes, is whether decedent's entire interest in the property was transferred in 1984, or were fractional interests conveyed in 1984, 1985, and 1986? The answer to this question turns on whether decedent had a right to reform the deed to conform to the parties' intentions. Dodge v. United States, supra; Touche v. Commissioner, 58 T.C. 565 (1972).

A gift is subject to tax only when the donor has so parted with dominion and control as to leave him no power to change its disposition. Sec. 25.2511-2(b), Gift Tax Regs. The gift tax is not applicable to a transfer of bare legal title, but only to a transfer of a beneficial interest in property. Sec. 25.2511-1(g)(1), Gift Tax Regs. Any gift in which the donor reserves the right to revest the beneficial title in himself is incomplete.

Sec. 25.2511-2(c), Gift Tax Regs.  Thus, for the purposes of the gift tax, a "gift is not consummate until put beyond recall." Burnett v. Guggenheim, 288 U.S. 280, 286 (1933).

Previously, under facts similar to those now before us, this Court has held that because the taxpayer had, in the years then before us, the right to reform the deeds of gift and revest title in herself, no completed gift was made during those taxable years for the portion of the property transferred in error.  Touche v. Commissioner, supra at 569; Bergeron v. Commissioner, T.C. Memo. 1986-587; Dodge v. Commissioner, T.C. Memo. 1968-238 (finding a right to reform gifts to convent in amounts larger than intended by donor or expected by recipients); see also Dodge v. United States, 413 F.2d at 1242 (adopting the analysis of the Tax Court in Dodge v. Commissioner, T.C. Memo. 1968-238).[7]  As to the portion of the property that was transferred according to the intent of the donor, however, this Court found that the transfer was a completed gift.  Touche v. Commissioner, supra; Bergeron v.

---

[7]     In Dodge v. United States, 292 F.Supp. 573, 576 (S.D. Fla. 1968), affd. 413 F.2d 1239 (5th Cir. 1969), the District Court held that a deed executed by the taxpayer purporting on its face to transfer a greater number of acres than what the donor intended, was and could be properly reformed under the laws of the State of Minnesota (the State in which the property was located) on the basis of mutual mistake of the donors and the donee.  On appeal the Court of Appeals for the Fifth Circuit confined itself to legal issues centering on the existence of a unilateral error.  The court, expressing its belief that the State of Minnesota would not depart from the prevailing rule allowing reformation, affirmed.  Dodge v. United States, 413 F.2d at 1243.

Commissioner, supra; Dodge v. Commissioner, T.C. Memo. 1968-238; see also Dodge v. United States, 413 F.2d at 1243.

Under Georgia law, equity may intervene and reform a conveyance when the instrument fails to express accurately the intention of the parties. Ga. Code Ann. sec. 23-2-25, 23-2-30 (1982); Curry v. Curry, 473 S.E.2d 760, 761 (Ga. 1996); Fox v. Washburn, 449 S.E.2d 513, 514 (Ga. 1994); Sheldon v. Hargrose, 100 S.E.2d 898, 900 (Ga. 1957); McCollum v. Loveless, 200 S.E. 115, 117 (Ga. 1938). Reformation as applied to a contract is a remedy cognizable in equity for the purpose of correcting an instrument so as to make it express the true intention of the parties, where from some cause, such as fraud, accident, or mistake, it does not express such intention. The remedy is not available for the purpose of making a new and different contract for the parties, but is confined to establishment of the actual agreement. Cotton Sales Mut. Ins. Co. v. Woodruff, 451 S.E.2d 106, 107 (Ga. Ct. App. 1994). The cause of the defect is immaterial so long as the mistake is common to both parties to the transaction. Curry v. Curry, supra; Sheldon v. Hargrose, supra. A petition for reformation will lie where by mistake of the scrivener and by oversight of the parties, the writing does not embody or fully express the real contract of the parties. Curry v. Curry, supra; McLoon v. McLoon, 136 S.E.2d 740 (Ga. 1964). In order to justify relief in equity to a party claiming mistake, the evidence must be clear, unequivocal, and decisive as to the mistake. Scurry v. Cook, 59 S.E.2d 371 (Ga. 1950). The

negligence of the complaining party will not defeat her right to reformation if the other party has not been prejudiced. McCollum v. Loveless, supra at 118 (no prejudice in reformation of deed "so as to make it speak the truth").

In Curry v. Curry, 473 S.E.2d 760 (Ga. 1996), Cordelia Simmons (Cordelia) told her attorney that she wanted to give her grandson, Enos Curry (Enos), the "property 'where * * * [her] house sits'", and instructed her attorney to prepare a deed conveying it to him. Id. at 761. When she signed the deed, the space for the property description was blank. Her attorney added a description of an adjoining lot that Cordelia had previously conveyed, and then delivered the deed to Enos, who recorded it. Neither Cordelia nor Enos read the deed at any time. Id. Later, after Cordelia was declared incompetent, Cordelia's guardian, James Curry (James), filed a complaint against Enos, seeking ejectment and a declaratory judgment. It was only after James filed this ejectment action that the grantee learned that the deed conveyed the wrong lot. Id. at 762.

The issue before the Supreme Court of Georgia was whether Enos was entitled to reformation of the deed based on the mistaken description of the property. The court found that the error in the deed describing a lot that Cordelia had already conveyed was a mistake common to both parties, and it held that Enos was entitled to reformation of the deed to correct its erroneous description. Id.

Under the facts and circumstances of the case before this Court, we find that the mistake in the 1984 deed conveying decedent's entire interest in the Weinstock Residence was a scrivener's error which was not noted by either of the parties at the time of execution of the deed. Moreover, this mistake violated the manifest intention of the parties to the deed. We do not think that a scrivener's error in describing the fractional interest to be conveyed in a gratuitous transfer of real estate, as in the case at bar, is so different from the scrivener's error in describing the particular lot to be conveyed in the gratuitous transfer in Curry. We believe that the Supreme Court of Georgia would, under the facts and circumstances of this case, find that the original 1984 transfer passed only bare legal title to decedent's entire interest in the property and that, immediately after such transfer, decedent had the unqualified right, as against the donees, to defeat the transfer as to the extent of six-ninths thereof. Therefore, under the law of Georgia, we find that decedent would have had a right to reform the deed to express the agreement of the parties.

Thus, we find that in 1984 the donees were given complete ownership of three-ninths of decedent's interest in the property and bare legal title to the other six-ninths. Decedent had the right, after the 1984 transfer, to revest in herself title to that six-ninths interest. She could take it back at will. The fact that her power was dehors the instrument, rather than expressed in the instrument itself, is immaterial. Helvering v.

Hemholz, 296 U.S. 93 (1935); Burnet v. Guggenheim, 288 U.S. 280 (1933); Dodge v. Commissioner, T.C. Memo. 1968-238. It follows that, inasmuch as decedent had, during 1984, the power to revest title in herself as to six-ninths of the property, six-ninths of decedent's transfer in 1984 was illusory and therefore did not have the necessary degree of completeness to be recognized for Federal tax purposes. Burnet v. Guggenheim, supra; sec. 25.2511-2(c), Gift Tax Regs.

We are satisfied, as our findings of fact show, that decedent transferred three-ninths of her interest in the Weinstock Residence in 1984. With respect to 1985 and 1986, the situation is very similar. Deeds of three-ninths interests for 1985 and 1986 were submitted in evidence. Accordingly, we find that in 1985, the donees were given complete ownership of an additional three-ninths of decedent's interest in the property, and decedent had the right to revest title in herself as to the remaining three-ninths defeasible interest. Cf. Dodge v. Commissioner, T.C. Memo. 1968-238 (Court could not find taxpayer transferred his retained interest in the property where he offered no persuasive evidence of the transfer). Thus, after her transfer in 1985, only three-ninths of decedent's transfer in 1984 was illusory and did not have the necessary degree of completeness to be recognized for Federal tax purposes. Burnet v. Guggenheim, supra; sec. 25.2511-2(c), Gift Tax Regs.

Finally, in 1986 decedent deeded the last of her interest in the property to her children, and decedent's right to revest

title in herself and the residue of her dominion and control over the Weinstock Residence terminated. Thus, we find that decedent made gifts of one-ninth of her interest in the Weinstock Residence to each of her three children in 1984, 1985, and 1986.

Respondent pleads, by amendment to the answer, that if this Court should find that decedent did not make a gift with a value of $90,000 in 1984, that decedent made a gift of $90,000 in "some later year." This pleading is a new matter; thus, the burden of proof is upon respondent. Rule 142(a).

The issue is whether the $90,000 that decedent transferred to her children after they quitclaimed their interests in the Weinstock Residence to the Carolyn Trust was in consideration of the conveyance, or if it was a gratuitous transfer without consideration.

Respondent was unable to introduce evidence of exactly when decedent transferred $90,000 to her three children; however, respondent did submit into evidence two letters he received from petitioner's attorney which state that "[Decedent] repurchased the house in 1987 from her children for $90,000 in order to satisfy the purchasers of that part of the property." In addition, Jack testified at trial that decedent borrowed $120,000 and gave each of the children-transferees $30,000 shortly after they transferred their interests in the Weinstock Residence to the Carolyn Trust.

The evidence submitted by respondent does not support the determination; thus, respondent has failed to meet his burden of

proving that the $90,000 transfer was a gift. To the contrary, the evidence, both that submitted by respondent and the testimony of Jack, supports a finding that, in substance, decedent purchased the interests held by her children in the property and conveyed them to the Carolyn Trust.

Furthermore, in 1986, the family decided to offer the whole of its property, including the Weinstock Residence and the undeveloped property, for sale as a single contiguous unit. For some time prior to that decision, decedent's cash requirements were being met by a series of loans, and it is undeniable that she expected the substantial gain she would realize on the sale of the property to allow her to retire the loans and eliminate her liquidity problems. The facts, therefore, show that decedent had a substantial interest in the sale of the whole property proceeding unimpeded by minor problems with title to a small portion of it.

Accordingly, we find, based on the facts and circumstances, that decedent's transfer of $90,000 to Lewis, Betty, and Jack in 1987 was paid in consideration of the transfer of their interests in the Weinstock Residence to the Carolyn Trust.

Issue 2. Whether the 12 $10,000 Annual Gifts Decedent Made in Each of the Years of 1985 Through 1988 Were Transfers of Present Interests That Qualify for the Exclusion under Section 2503(b)

In 1985, decedent began a program of making annual gifts to Lewis, Betty, and Jack, and her daughter-in-law, Ellen, and the eight Weinstock Trusts that benefited her grandchildren

(collectively, the donees).[8]  Each year, from 1985 through 1988, decedent made checks for $10,000 payable to each of the donees and gave them to her agent, Jack, for delivery.

In each of the years, decedent did not have enough cash to fund the gifts, so she arranged, through her agent, to borrow the funds from First National Bank of Atlanta (First National).[9]

The Loan Process

Decedent borrowed $120,000 in 1985, 1986, 1987, and 1988 to fund the gifts.  Typically, each year shortly before making the gifts, decedent wrote out checks for $10,000 to each of the donees, and signed a note for $120,000.  She gave the checks and the signed note to her agent, Jack, who went to First National and executed the loan on her behalf.  First National issued a cashier's check for $120,000 to decedent, which Jack deposited in decedent's checking account at the Trust Company Bank.  Although the loans were unsecured, Jack guaranteed the notes, both personally and as agent for decedent.

After the loan proceeds were deposited in decedent's account, the trustees for the Weinstock Trusts, Jack and Lewis,

---

[8]    Decedent's daughter-in-law, Ellen, is the wife of Jack; the eight Weinstock Trusts that were created to benefit decedent's grandchildren are: The Carolyn A. Holland Trust, The Beth R. Holland Trust, The Lynn P. Holland Trust, The Richard L. Holland Trust, The Lewis G. Holland, Jr. Trust, The Alan P. Koblitz Trust, The Richard S. Koblitz Trust, and The Jeffrey L. Koblitz Trust.

[9]    First National Bank of Atlanta later changed its name to Wachovia Bank.  Decedent did business with the bank under both of its names.

endorsed the checks payable to the eight Weinstock Trusts, and each of the other donees endorsed the checks payable to them. The endorsed checks were deposited into the Jack K. Holland-Agent account (Holland-Agent account) at First National. A check for $120,000 was then drawn on that account to purchase a $120,000 certificate of deposit (CD) for the donees. Jack then pledged the CD as security for his guarantee as decedent's agent.

### The Certificates of Deposit

Decedent, Lewis, Betty, and Jack discussed how the gifts were to be used prior to decedent's taking out the loan or making the gifts. Although the issuance of the loan proceeds, the pooling of the gifts, and the execution of the pledge all occurred during the same visit to First National, both the parents of the minor beneficiaries and the adult beneficiaries of the Weinstock Trusts were given actual notice that the gifts were being made, and that they had the right to the immediate use of the money.[10] The donees unanimously agreed to pool their gifts in order to realize a greater return on their investments.

Pooling the gifts to purchase the CD and pledging it to secure Jack's guarantee of the note benefited both the donees and the donor. The interest rate paid on a $120,000 CD was higher than the interest rate paid on a CD in an amount less than $100,000. Thus, by pooling their gifts, the donees were able to

---

[10] Decedent's children are the parents of the beneficiaries of the eight Weinstock Trusts.

receive a greater rate of interest than if they had each bought a CD in the amount of the individual gifts.

Pledging the CD's as security for Jack's guarantee benefited decedent by lowering her cost of borrowing. When Jack executed the loan agreement on behalf of decedent, he negotiated the rate of interest that the bank would charge for the loan with the bank's representative, Mr. Marshall Wellborn (Wellborn). Wellborn and Jack were friends, and the bank regarded the Holland family as a valuable account. Accordingly, the bank accepted Jack's strategy to make the loan "self-funding" by accepting his pledge of the CD as security for his guarantee. The interest rate on a self-funded loan was only 1-½ percent above the interest rate paid on the $120,000 CD. First National did not require the CD to be pledged for it to make the loan; however, without the pledge the interest rate on the loan would have been higher. Therefore, the purpose of pledging the CD as security for Jack's guarantee of decedent's unsecured loan was to reduce decedent's cost of borrowing.

Decedent paid the interest on the loans when it became due, and the donees received the interest paid each month by First National on the CD's. Each year, Jack issued a Form 1099 to each donee reporting the amount of interest paid, and each of the Weinstock Trusts filed Federal and State income tax returns for 1985, 1986, 1987, 1988, and 1989, reporting the interest received on the CD's.

Decedent renewed the notes each year, until she paid them on June 9, 1988, following the sale of 28.75 acres of Weinstock property. Until decedent paid off the loans, Jack purchased new CD's each year to replace the ones that matured.

First National continued to hold the CD's after decedent paid her indebtedness to the bank. As the CD's matured, the proceeds were deposited into the Holland-Agent account, and then distributed to the donees. After the distribution of the proceeds, some of the Weinstock Trusts purchased new CD's from First National, and some made other investments.

Respondent determined that the donees never had dominion and control over any of the CD's pledged as security for decedent's agent's guarantee of the unsecured notes, and therefore that the transfers were incomplete gifts of future interests. Furthermore, respondent determined that the $10,000 gifts that decedent made each year in 1985, 1986, 1987, and 1988, were completed in 1988 when decedent paid off the bank loans and the CD's were no longer pledged to secure Jack's guarantee.

Respondent added the value of all of these transfers to the taxable estate as adjusted taxable gifts for purposes of determining the tentative estate tax. Accordingly, respondent increased the value of the taxable estate by $480,000. Petitioner asserts that the annual gifts were gifts of present interests that decedent properly excluded from her taxable gifts under section 2503(b).

Under section 2503(b), a donor shall exclude the first $10,000 of gifts made to each of her donees from the total amount of gifts for a calendar year made to each donee.  Sec. 2503(b). However, a parenthetical provision in the section forecloses any exclusion for gifts of future interests in property.  Id.  A future interest is one that is "limited to commence in use, possession, or enjoyment at some future date or time."  Sec. 25.2503-3(a), Gift Tax Regs.  The Supreme Court stated in Fondren v. Commissioner, 324 U.S. 18, 20 (1945):

> it is not enough to bring the exclusion into force that the donee has vested rights.  In addition he must have the right presently to use, possess or enjoy the property.  These terms are not words of art, like 'fee' in the law of seizin * * * , but connote the right to substantial present economic benefit.  The question is of time, not when title vests, but when enjoyment begins. * * *

Petitioner cites Foley v. Allen, 170 F.2d 434 (5th Cir. 1948),[11] as support for its argument that the transfers by decedent were completed gifts.  In Foley, a mother gave her son a gift of 200 shares of stock that she had pledged to First National Bank of Atlanta as security for loans the bank had earlier made to her.  The Commissioner contended that the mother retained dominion and control over the property as it remained pledged to the bank for her indebtedness at the time of transfer. Therefore, according to the Commissioner, there was no completed

---

[11]    In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Court of Appeals for the Eleventh Circuit adopted as binding precedent all of the decisions of the former Court of Appeals for the Fifth Circuit handed down prior to the close of business on Sept. 30, 1981.

gift.  <u>Id.</u> at 436.  In finding that, under the law of the State of Georgia, the donor made a completed gift, the court stated that it was aware of no rule or principle that prevents the donor from making a valid gift of personal property that is subject to a lien or that theretofore had been pledged to secure an indebtedness.  The court held:

> The fact, * * * , that the donee, without being required to do so as a condition of the gift, consents for the subject of the gift to remain pledged for the use and benefit of the donor until the debt is paid is not, in our judgment, repugnant to a valid gift nor would such consent constitute a retention of dominion and control by the donor over the property donated.  [<u>Id.</u> at 437.]

Under the facts of the instant case, we find that decedent's annual transfers to the donees were completed gifts.  The gifts were complete when the checks for $10,000 were cashed.[12]  It is indisputable that the loan for $120,000 had to be executed before the checks could be cashed by the donees.  It is also indisputable that the donees had to receive and endorse the checks, and then return them to Jack, as their agent, before he could deposit the checks in the agency account and purchase the CD.  Only after Jack purchased the donees' CD could he pledge it as security for his guarantee as decedent's agent for her unsecured loan.  Thus, the loan was executed before the CD was pledged, or even purchased.  The gifts, and the donees' interests

---

[12]    See the discussion of when a gift of a check is complete <u>infra</u> Issue 3.

in the gifts, were therefore separate and independent from the pledge of the CD.

Moreover, it was not the donor who pledged the CD, but the agent of the recipients.  Thus, pledging the CD's was a voluntary act.  Therefore, both the recipients and First National treated the CD's as the recipients' present interest.

Finally, decedent bore the burden of paying the bank the interest on the loans when it became due, and the donees enjoyed the present benefit of the interest on the CD's paid to them by the bank; therefore, the transfers were complete in substance as well as in form.  Thus, at least as to the individual recipients, decedent relinquished, and the donees acquired, dominion and control over the gifts.  Muserlian v. Commissioner, T.C. Memo. 1989-493 (in prearranged transfers among family members the issue is whether the taxpayer retained all valuable incidents of ownership, control, and enjoyment of the funds while making the semblance of a gift), affd. 932 F.2d 109 (2d Cir. 1991); Elbert v. Commissioner, 45 B.T.A. 685 (1941).  (The effect on the trusts is discussed below.)

Deductibility of the Annual Gifts to the Individual Donees

We hold that the gifts of $10,000 made each year in 1985, 1986, 1987, and 1988 to Lewis, Betty, Jack, and Jack's wife, Ellen, were completed gifts in which the donees had a present interest.

This holding, however, is not a holding that the $10,000 transfers in 1985 and 1986 to Lewis, Betty, and Jack are excluded

under section 2503(b) from decedent's taxable gifts.  Section 2503(b) excludes from taxable gifts only the first $10,000 of gifts made by a donor to a person in a calendar year.  We found in supra Issue 1. that decedent transferred fractions of her interest in the Weinstock Residence to Lewis, Betty, and Jack in 1984, 1985, and 1986.  Neither the specific dates in 1985 and 1986 of the transfers,[13] nor the value of decedent's interest in the Weinstock Residence on those dates,[14] are in the record.  The $10,000 cash transfers to the children in 1985 and 1986 were completed gifts when the checks were paid by the drawee on December 17, 1985, and January 14, 1986, respectively.[15]

Section 2503(b) does not exclude from taxable gifts the amount by which the sum of the value of the one-ninth interest in decedent's life estate plus the $10,000 in cash transferred to each child exceeds $10,000.

Respondent's Additional Arguments Regarding the Annual Gifts to the Eight Weinstock Trusts

Although we have concluded that the annual gifts to the decedent's children and her daughter-in-law were gifts of present

---

[13]   The 1985 and 1986 deeds are undated except for the year.

[14]   The age of decedent on the dates on which the interests in the Weinstock Residence were transferred will determine the value of those interests.  See supra note 4; sec. 20.2031-7A(d)(6), Estate Tax Regs.

[15]   A gift made by check is not complete until the check is honored by the drawee.  See discussion supra Issue 3.

interests, respondent raises an additional issue whether the transfers decedent made in trust were gifts of present interests.

The trustees of the eight Weinstock Trusts are Jack and Lewis. The beneficiaries of the Weinstock Trusts, and their ages at the time of the 1985 transfers in trust, were Lewis's children: Richard, Lewis, Jr., and Lynn, age 22, 21, and 15, respectively; Betty's children: Jeffrey, Alan, and Richard, age 23, 21, and 18, respectively; and Jack's children: Beth and Carolyn, age 9 and 6, respectively.

The eight Weinstock Trusts were identical except for the name of the beneficiary and in Paragraph II(a) each trust provided the beneficiaries the legal right to make a demand upon the trustees for payment up to the value of any gifts transferred to the trust during the year of the transfer. Respondent, however, contends that the gifts were not gifts of present interests for two additional reasons: (1) The beneficiaries were not provided written notice of the gifts and their right to withdraw as required by the trust (the notice issue); and (2) decedent and the donees had an agreement that the beneficiaries would not withdraw the gifts from the trusts (the agreement issue). We disagree with respondent's contentions and address them in order.

The seminal cases on the issue of whether a transfer in trust is a gift of a present interest are Crummey v. Commissioner, 397 F.2d 82 (9th Cir. 1968), affg. in part and

revg. on this issue T.C. Memo. 1966-144, and Estate of Cristofani v. Commissioner, 97 T.C. 74 (1991).

In Crummey v. Commissioner, supra, the settlors created an irrevocable living trust for the benefit of their four children, some of whom were minors. The trust provided that the trustee could receive any real or personal property from the trustors or anyone else or any other source. With respect to such additions to the corpus, each child was given an absolute power to withdraw up to $4,000 in cash by making a written demand upon the trustee prior to the end of the calendar year of the addition.

Relying on this power, the settlors claimed the section 2503(b) exclusion on transfers of property to the trust for each trust beneficiary. Respondent allowed the exclusion with respect to the gifts in trust for the beneficiaries who were adults, but disallowed the exclusion for the minor beneficiaries. The ground for the disallowance was that the minors' powers were not gifts of present interests.

In deciding whether the minor beneficiaries received a present interest, the Court of Appeals for the Ninth Circuit specifically rejected any test based upon the likelihood that the minor beneficiaries would actually receive present enjoyment of the property. In fact, the court stated that "it is likely that some, if not all, of the beneficiaries did not even know that they had any right to demand funds from the trust." Id. at 88. Instead, the court concluded that all exclusions should be

allowed under the test in <u>Perkins v. Commissioner</u>, 27 T.C. 601 (1956), or the "right to enjoy" test in <u>Gilmore v. Commissioner</u>, 213 F.2d 520 (6th Cir. 1954), revg. 20 T.C. 579 (1953). <u>Crummey v. Commissioner</u>, <u>supra</u> at 88. The Court of Appeals interpreted <u>Perkins</u> to hold that all that is necessary is to find that the demand could not be "legally resisted." <u>Id.</u>

The Notice Issue

The Weinstock Trusts require that whenever any transfer of property is made to the trusts, the trustee shall give written notice to the beneficiary of his or her withdrawal rights. However, neither Jack nor Lewis ever gave the adult beneficiaries, or the parents of the minor beneficiaries, written notice. The trustees' failure to comply with this trust provision, however, does not require a finding that the beneficiaries did not have present interests in the gifts.

The sufficiency of the notice given the beneficiaries is a factor in the likelihood that the right of withdrawal will be exercised; it is not a factor in the legal right to demand payment from the trustee. <u>Crummey v. Commissioner</u>, 397 F.2d at 88; <u>Estate of Cristofani v. Commissioner</u>, <u>supra</u> at 80-81. Furthermore, during the years of the transfers, the only minor beneficiaries of the Weinstock Trusts were the children of the trustees.[16] We do not think that the failure of a trustee to

---

[16] In general, the age of legal majority in the State of
(continued...)

give written notice to himself should require a finding that notice was not given.

Finally, convincing testimony was heard at trial that the adult beneficiaries were given actual notice of the gifts and their right to immediately withdraw the money. For instance, Richard Holland, the adult son of Lewis, testified that he did not receive written notice of the gifts, but that he discussed the gifts with decedent, as well as with Jack, and he was aware that he had the use of the money if he wanted it.

The Agreement Issue

In Estate of Cristofani v. Commissioner, supra, this Court held in a reviewed decision that the donor's transfers in trust for her minor grandchildren, who held unexercised demand rights and contingent remainder interests in the trust, qualified as gifts of present interests under section 2503(b). Following the decision of the Court of Appeals for the Ninth Circuit in Crummey v. Commissioner, supra, we stated that the correct test in deciding whether the minor beneficiaries received a present interest is whether they have a legal right to make a demand for

---

[16](...continued)
Georgia is 18 years. Ga. Code Ann. sec. 39-1-1(a) (1988). An exception to this general rule is the definition of "minor" under The Georgia Transfers to Minors Act (the Act). Under the Act, the term "minor" means an individual who has not yet attained the age of 21 years. Ga. Code Ann. sec. 44-5-111(11) (1988); 1972 Ga. Laws, sec. 10. Neither party in this action submitted evidence that the transfers in trust were made in conformity with the Act. In view of this lack of evidence, we are unwilling to assume an exception to the general rule for the transfers at issue.

payment upon the trustee; not whether it is likely that the minor beneficiary is to receive any present enjoyment of the property. Id. at 80-81. Furthermore, we found no agreement or understanding between the grantor, the trustees, and the beneficiaries[17] that the grandchildren would not exercise their withdrawal rights following a contribution to the children's trust. Id. at 77, 83.

In Estate of Cristofani the transfers at issue were the transfers in trust to the secondary beneficiaries who had only contingent remainder interests in the trusts. The interests in issue in the instant case, however, are the interests of the primary beneficiaries, whose interests are not contingent. Thus, Estate of Christofani is distinguishable from the case at bar.

That distinction notwithstanding, we agree with respondent that if the beneficiaries, trustees, and donor had an agreement or understanding that limited the ability, in a legal sense, of the beneficiaries to exercise their right to withdraw trust corpus, then the beneficiaries may not have received gifts of a present interest.

Respondent contends that there was an agreement between the decedent, the trustees, and the beneficiaries that denied the trust beneficiaries a present interest in the transfers. In

---

[17] In Estate of Cristofani v. Commissioner, 97 T.C. 74 (1991), the children of the grantor were the trustees and also the primary trust beneficiaries. The grandchildren of the grantor were the children of the trustees and also were the contingent remainder beneficiaries. Id. at 75-76.

respondent's view, the fact that the family discussed how the children would use the gifts prior to decedent's making the transfers, and then pooled the gifts to buy a CD that Jack pledged as security for his guarantee, is evidence of this agreement. We disagree.

There is no evidence to support a finding that the donees' legal ability to demand payment from the trustees was limited by their informal agreement to purchase a CD after the gifts were made. Nor is there any evidence that decedent would not have made the gifts to any donee who did not agree to invest rather than spend the gift.

To the contrary, the facts of this case support a finding that the family was investment orientated, that they discussed various investment choices, and they agreed that the best choice was to pool their gifts to purchase a larger CD that paid a higher rate of interest than the rate they would have received if they had each bought a smaller CD in the amount of the individual gifts. The fact that Jack was able to pledge the CD after the donees purchased it to lower decedent's cost of borrowing in no way limited the donees' legal ability to demand payment from the trustees before the CD was purchased.

We hold, therefore, that the $10,000 annual transfers decedent made to each of the eight Weinstock Trusts in 1985, 1986, 1987, and 1988, were transfers of present interests.

Issue 3.  Whether 12 Checks Decedent Wrote and Delivered to Her
Agent 4 Days Before She Died Were Completed Gifts; If Not,
Whether the Checks Are Claims Against the Estate That May Be
Deducted Under Section 2053

Decedent intended to make gifts of $10,000 to each of her
children and grandchildren during 1989.  On November 21, 1989,
she wrote 12 checks, each for $10,000 (total $120,000), and gave
them to her son, Jack, to deliver to the donees.  Unlike the
gifts she made in prior years, these checks were made to each of
the donees personally, and none were payable to the Weinstock
Trusts. At the time decedent wrote the checks, she had $89,799 in
her checking account.  Jack placed the checks in his desk at home
for safekeeping, and then went to Florida with his family for
Thanksgiving.  Jack intended to arrange a bank loan for the
amount of the checks when he returned, and then to deliver the
checks to the donees.

On November 25, 1989, while Jack was still in Florida,
decedent was killed in an automobile accident.  After the demise
of decedent, Jack replaced the 12 checks signed by decedent with
12 new checks drawn on the estate account, which he signed as a
coexecutor.[18]  Jack delivered the replacement checks to the 12
payees of the checks signed by decedent, and the payees cashed
these replacement checks.  The 12 checks signed by decedent were
never delivered to the intended donees nor deposited, and

---

[18]    The $10,000 check to Jack was written and signed by his
brother, Lewis, who was also an executor of the estate.

remained in Jack's possession. Petitioner excluded the amount of the 12 checks, $120,000, from the value of the estate in the Federal estate tax return filed on February 25, 1991.

Respondent determined that decedent died before the transfer of the 12 checks was completed, and that the $120,000 is therefore includable in the value of the estate. Petitioner asserts that the gifts were completed when decedent handed the checks to Jack for delivery, are nontaxable gifts under section 2503(b), and were, therefore, properly excluded from the estate. In the alternative, petitioner asserts that the total amount of the checks is allowed as a deduction under section 2053(a)(3) as a claim against the estate.

Section 2001 imposes a tax on the transfer of the taxable estate of all citizen and resident decedents. Section 2051 defines taxable estate as the gross estate less deductions. "The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death." Sec. 2033. Whether decedent had an interest in property at the time of her death is governed by State law. Estate of Gamble v. Commissioner, 69 T.C. 942, 948 (1978). Petitioner has the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

The issue is whether the amounts represented by the checks issued by decedent 4 days before her death, but not paid until after her death, are properly excludable from the gross estate.

Respondent's regulations provide:

> The amount of cash belonging to the decedent at the date of death, whether in his possession or in the possession of another, or deposited with a bank, is included in the decedent's gross estate. If bank checks outstanding at the time of decedent's death and given in discharge of bona fide legal obligations of the decedent incurred for an adequate and full consideration in money or money's worth are subsequently honored by the bank and charged to the decedent's account, the balance remaining in the account may be returned, but only if the obligations are not claimed as deductions from the gross estate. [Sec. 20.2031-5, Estate Tax Regs.]

## Whether the Gifts Were Complete

We turn now to the question as to whether under State law the gifts were completed prior to decedent's death so as to exclude the amounts involved from her estate. The elements of a valid gift are: Intention to give; a renunciation of the right of ownership by the giver without power of revocation; and delivery of the possession by the giver to the recipient. Upchurch v Upchurch, 45 S.E.2d 855, 856 (Ga. Ct. App. 1947). Under Georgia law, to constitute a valid inter vivos gift the following criteria must be met: (1) the donor must intend to give the gift; (2) the donee must accept the gift; and (3) the gift must be delivered or some act which under law is accepted as a substitute for delivery must be done. Ga. Code Ann. sec. 44-5-80 (1991); NeSmith v. Ellerbee, 416 S.E.2d 364, 366 (Ga. Ct. App. 1992).

Whether the third criterion, delivery, has been met is in dispute. Failure of delivery invalidates the gift. Furthermore,

without valid delivery, the intent of the donor may be in question.

In any event, a delivery to be sufficient to support a gift must be absolute and unqualified; it must vest the donee with, and divest the donor of, control and dominion over the property. Ansley v. Sunbelt Invs. Realty , Inc., 337 S.E.2d 448, 450 (Ga. Ct. App. 1985). It is well settled that if a donor retains a power of revocation, a valid inter vivos gift cannot be completed. Stewart v. Stewart, 186 S.E.2d 746, 747 (Ga. 1972); Guest v. Stone, 56 S.E.2d 247 (Ga. 1949); see also Drake v. Wayne, 184 S.E. 339, 342 (Ga. Ct. App. 1936) ("A delivery of property subject to be reclaimed by the donor at any time prior to his death, * * *, does not constitute a valid gift inter vivos.").

Under the facts of this case, the checks are not valid inter vivos gifts due to the failure of delivery. Georgia law provides that a customer may stop payment of a check drawn on the customer's account prior to action by the drawee. Ga. Code Ann. sec. 11-4-403 (1991); Hardeman v. State, 268 S.E.2d 415, 417 (Ga. Ct. App. 1980); Fulton Natl. Bank v. Delco Corp., 195 S.E.2d 455 (Ga. Ct. App. 1973); Mason v. Blayton, 166 S.E.2d 601, 603 (Ga. Ct. App. 1969); Stewart v. Western Union Tel. Co., 64 S.E.2d 327, 329 (Ga. Ct. App. 1951). Due to her power to stop payment of the checks before the bank paid them, decedent retained the power to revoke the gifts; thus, the funds still belonged to her. Because

decedent had not relinquished complete dominion and control over the funds before her death, the checks were not completed gifts. Burnett v. Guggenheim, 288 U.S. at 286 (a gift is not consummate until put beyond recall); sec. 25.2511-1(g)(1), Gift Tax Regs.

Moreover, there were insufficient funds in decedent's account to cover the checks when they were written and when she died. She could not have intended to relinquish control until the borrowed funds were deposited in her account. See also Estate of Dillingham v. Commissioner, 88 T.C. 1569, 1576 (1987) (checks not cashed until 35 days after delivery to donees, without explanation of the reason for the delay, casts doubt as to whether the checks were unconditionally delivered, or whether decedent had sufficient funds to cover the checks at the time they were delivered), affd. 903 F.2d 760 (10th Cir. 1990).

Despite our holding that decedent retained control over the checks, petitioner may still prevail if we agree that payment of the replacement checks relates back to the delivery of the original checks.

In Estate of Gagliardi v. Commissioner, 89 T.C. 1207 (1987), we addressed the question of whether the relation-back doctrine should apply to checks that were not cashed until after the donor's death. Id. at 1211. Assuming the date of payment of the checks related back to the date the checks were issued (prior to the donor's death), the amount of the checks would be excluded from the donor's Federal gross estate.

We held in Estate of Gagliardi that the relation-back doctrine does not apply where a check made payable to a noncharitable donee is not cashed prior to the donor's death. Id. at 1212.

However, in Estate of Metzger v. Commissioner, 100 T.C. 204 (1993), affd. 38 F.3d 118 (4th Cir. 1994), we found no reason for refusing to apply the relation-back doctrine to noncharitable gifts where the taxpayer is able to establish: (1) The donor's intent to make a gift, (2) unconditional delivery of the check, and (3) presentment of the check within the year for which favorable tax treatment is sought and within a reasonable time of issuance.  Thus, giving due consideration of all the facts and circumstances, we concluded that the checks in question in Estate of Metzger were unconditionally delivered to the donees in the year issued. Id. at 215.

In Estate of Metzger, unlike the case at bar, the donor was alive at the time the checks were presented to the bank for payment, the donor had sufficient funds in his account to pay the checks, and the donees presented the checks for payment within the year for which the favorable tax treatment was sought.

In the case at bar, decedent died before delivery was made to the donees, decedent did not have sufficient funds in her account to pay the checks, and the checks issued by decedent were never presented to the bank for payment.  Moreover, none of the factors enumerated in Estate of Metzger that must all be

present for the relation-back doctrine to apply are present in the instant case. We, therefore, can find no support in Estate of Metzger for petitioner's assertion that the checks decedent gave to Jack to deliver to her donees were completed gifts excludable under section 2503(b) at the time she gave them to Jack.

Considering all the facts and circumstances, we conclude that under the law of the State of Georgia the 12 $10,000 checks issued by decedent were incomplete gifts at the time of her death and that the 12 replacement checks cashed by the donees do not relate back to the date decedent issued the original checks.

Whether the Checks Were Debts

Petitioner asserts in the alternative that if the checks were not completed gifts, then they were debts owed by decedent at the time of her death, and therefore are deductible as a claim against the estate.

Section 2053(a) provides that the value of the gross estate shall be determined by deducting from the value of the gross estate the amount of the claims against the estate as are allowable by the laws of the jurisdiction under which the estate is being administered. Sec. 2053(a)(3). Only claims representing enforceable, personal obligations of the decedent existing on the date of the decedent's death are deductible as claims against the estate. Sec. 20.2053-4, Estate Tax Regs.

Further, in order to be deductible under section 2053(a)(3),

claims against the estate founded on a promise or agreement must be "contracted bona fide and for an adequate and full consideration in money or money's worth". Sec. 2053(c)(1)(A). One purpose of the consideration requirement of section 2053(c) is to prevent decedents from reducing their taxable estates for Federal estate tax purposes by reflecting in contractual form transfers which serve a donative intent. United States v. Stapf, 375 U.S. 118, 130-133 (1963); Bank of New York v. United States, 526 F.2d 1012, 1016 (3d Cir. 1975). Situations in which estate tax deductions have been allowed under section 2053(a)(3) for payments made to family members typically involve arm's-length agreements that are supported by actual consideration, not by mere donative intent. Estate of Huntington v. Commissioner, 100 T.C. 313, 316 (1993), affd. 16 F.3d 462 (1st Cir. 1994).

Petitioner offered no evidence that the checks were "contracted bona fide and for an adequate and full consideration in money or money's worth". Sec. 2053(c)(1)(A). To the contrary, the facts show clearly that decedent intended the checks to be gifts. The intent to make a gift is not an intent to create a bona fide debt. Estate of Labombarde v. Commissioner, 58 T.C. 745, 755 (1972). Although section 25.2511-1(g)(1), Gift Tax Regs., provides that donative intent is not an essential element on the part of the transferor for the application of the gift tax to the transfer, it is also true that "A gift in the statutory sense, * * * , proceeds from a 'detached

and disinterested generosity,' * * * 'out of affection, respect, admiration, charity, or like impulses,'" Commissioner v. Duberstein, 363 U.S. 278, 285 (1960) (quoting Commissioner v. LoBue, 151 U.S. 243, 246 (1956) and Robertson v. United States, 343 U.S. 711, 714 (1952)), which precludes a bargained-for exchange supported by adequate and full consideration in money or money's worth.  Thus, we cannot find that the checks represent intended payment of a bona fide debt of decedent.

We find that the 12 $10,000 checks were intended to be gifts, and were, by the law of the State of Georgia, incomplete gifts.  As incomplete noncharitable gifts, the intended transfers cannot create a claim against the estate.  See Estate of Gagliardi v. Commissioner, 89 T.C. at 1212-1213.  We hold, therefore, that the $120,000 was improperly excluded from the value of the estate.

Issue 4.  Whether the Transfer of $100,000 From the J. Kurt Holland Residual Trust to Decedent Created a Debt That is Deductible Under Section 2053

J. Kurt Holland (Holland), decedent's spouse, died on August 15, 1979.  He created by will a marital deduction trust (The Marital Trust) and a residual trust (The J. Kurt Holland Residual Trust).  The Marital Trust was created to receive the fractional share of Holland's residuary estate which should equal the maximum marital deduction allowable in determining the Federal estate tax upon his estate, reduced by certain other dispositions of his property.  The J. Kurt Holland Residual Trust (the JKH

Trust) was created to receive the residue and remainder of Holland's estate not allocated to the Marital Trust. The trustees of the JKH Trust were authorized to encroach upon the corpus for the benefit of decedent, and to borrow or lend money in the execution and management of Holland's estate or testamentary trusts. Furthermore, the will provided that all encroachments and distributions from the trusts were to be free of interest.

The trustees of the JKH Trust were decedent, Lewis, and Jack. The Holland will further provided that upon the death of decedent, the corpus and the undistributed income of the JKH Trust were to be divided into equal shares for Lewis, Betty, and Jack. All of the taxable income of the JKH Trust was distributed to decedent annually during her lifetime and included in her taxable income.

On August 6, 1989, and again on September 25, 1989, the JKH Trust issued checks in the amount of $50,000 payable to decedent. The checks were deposited into an account called the Carolyn W. Holland Special Dividend Account (the Special Account). This account was established to receive the income from investments owned by decedent; the account was owned by decedent, but it was controlled by Jack.

Neither of the foregoing transfers were repaid by decedent prior to her death on November 25, 1989. On December 18, 1989, the executors transferred $50,000 to the JKH Trust to repay the

August 6, 1989, transfer; the value of the gross estate was reduced by this amount. The executors reported $50,000 on the Form 706 as a claim against the estate for the September 25, 1989, transfer; this amount has not yet been repaid.

Respondent determined that decedent's gross estate should not be reduced by the $50,000 reported on the Form 706, because repayment of the transfer is not a personal obligation of decedent that is enforceable under the jurisdiction in which the estate is administered. Petitioner asserts the $50,000 transferred to decedent on August 6, 1989, was a loan that she was obligated to repay. By an amendment to its petition, petitioner increased the amount of the claimed deduction by $50,000 to include the transfer on September 25, 1989, which it asserts was also a loan that decedent was obligated to repay. Respondent, in the answer to petitioner's amendment, denied the increase on the same ground as the denial of the original amount.

As discussed before in this opinion, section 2053 provides that the value of the gross estate shall be determined by deducting from the value of the gross estate the amount of the claims against the estate as are allowable by the laws of the jurisdiction under which the estate is being administered. Sec. 2053(a)(3). "The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death

* * * Only claims enforceable against the decedent's estate may be deducted."  Sec. 20.2053-4, Estate Tax Regs.  Further, in order to be deductible under section 2053(a)(3), claims against the estate founded on a promise or agreement must be "contracted bona fide and for an adequate and full consideration in money or money's worth".  Sec. 2053(c)(1)(A).

At the outset, we note that the fact that the estate paid the JKH Trust $50,000 after the date of decedent's death is not evidence that the earlier transfer created bona fide debt, nor is the fact that the estate did not pay $100,000 evidence that the additional $50,000 was not bona fide debt.  Propstra v. United States, 680 F.2d 1248, 1255 (9th Cir. 1982).  "The law is clear that post-death events are relevant when computing the deduction to be taken for disputed or contingent claims."  Id. at 1253.  The estate of decedent, however, did not contest or dispute the claim.  Thus, the post-death events, i.e., the repayment of one $50,000 transfer and the non-repayment of the other, are not relevant in computing the amount of the deduction to be taken for the alleged debt.

Furthermore, "when claims are for sums certain and are legally enforceable as of the date of death, post-death events are not relevant in computing the permissible deduction."  Id. at 1254.  Thus, the threshold determination to be made under section 2053(a)(3) is whether the claim in question was certain and enforceable at the time of the decedent's death.  Id.

It is incontrovertible that decedent received the $100,000 from the JKH Trust. Thus, the issue before this Court is whether, under State law, the trust's claim is an enforceable, personal obligation of decedent that was contracted bona fide.

Under the law of the State of Georgia, whenever one person, by contract or law, is liable and bound to pay another an amount of money, certain or uncertain, the relation of debtor and creditor exists between them. Ga. Ann. Code sec. 18-2-1 (1988). To constitute a valid contract, there must be parties able to contract, a consideration moving to the contract, the assent of the parties to the terms of the contract, and a subject matter upon which the contract can operate. Ga. Ann. Code sec. 13-3-1 (1982); Associated Muts. v. Pope Lumber Co., 37 S.E.2d 393, 396 (Ga. 1946). Until each party has assented to all the terms, there is no binding contract. Ga. Ann. Code sec. 13-3-2 (1982). The essence of mutual assent is the meeting of the minds of the parties. Taylor Lumber Co. v. Clark Lumber Co., 127 S.E. 905, 906 (Ga. Ct. App. 1925). Both parties must concur in all terms of the proposed contract, agreeing to the same thing in the same sense. Associated Muts. v. Pope Lumber Co., supra at 398.

A transfer of money is a loan for Federal income tax purposes if, at the time the funds were transferred, the transferee unconditionally intended to repay the money, and the transferor unconditionally intended to secure repayment. Haag v. Commissioner, 88 T.C. 604, 616 (1987), affd. without published

opinion 855 F.2d 855 (8th Cir. 1988); Litton. Bus. Sys., Inc. v. Commissioner, 61 T.C. 367, 377 (1973); see also Haber v. Commissioner, 52 T.C. 255, 266 (1969), affd. 422 F.2d 198 (5th Cir. 1970); Saigh v. Commissioner, 36 T.C. 395, 419 (1961).

Thus, before the value of decedent's estate may be reduced for the alleged debt, petitioner must prove that at the time of each transfer, decedent and the JKH Trust agreed that decedent would borrow $50,000, that decedent unconditionally intended to repay that amount to the JKH Trust, and that the JKH Trust intended to unconditionally secure repayment. Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

The determination of whether a transfer was made with a real expectation of repayment and an intention to enforce the debt depends on all the facts and circumstances including whether: (1) There was a promissory note or other evidence of indebtedness, (2) interest was charged, (3) there was security or collateral, (4) there was a fixed maturity date, (5) a demand for repayment was made, (6) any actual repayment was made, (7) the transferee had the ability to repay, (8) any records maintained by the transferor and/or the transferee reflected the transaction as a loan, and (9) the manner in which the transaction was reported for Federal tax is consistent with a loan. See Zimmerman v. United States, 318 F.2d 611, 613 (9th Cir. 1963); Estate of Maxwell v. Commissioner, 98 T.C. 594, 604 (1992), affd. 3 F.3d 591 (2d Cir. 1993); Estate of Kelley v. Commissioner, 63 T.C.

321, 323-324 (1974); Rude v. Commissioner, 48 T.C. 165, 173 (1967); Clark v. Commissioner, 18 T.C. 780, 783 (1952), affd. 205 F.2d 353 (2d Cir. 1953). The factors are not exclusive, and no one factor controls. Rather, our evaluation of the various factors provides us with an evidential basis upon which we make our ultimate factual determination of whether a bona fide indebtedness existed. See Estate of Maxwell v. Commissioner, supra at 604; Litton Bus. Sys., Inc. v. Commissioner, supra.

With the foregoing factors in mind, we turn to the facts and circumstances surrounding the transfers at issue to determine whether at the time of each transfer decedent entered into a bona fide creditor-debtor relationship with the JKH Trust.

1. Promissory Note or Other Evidence of Indebtedness With Respect to the Transfers at Issue.

Decedent never signed any promissory notes with respect to the transfers at issue. While it is true that decedent never executed a note or other singular debt instrument, we do not consider the absence of such instrument a significant factor in this particular case. It is quite clear that a valid debt may exist between parties even where no formal debt instrument exists. Litton Bus. Sys., Inc. v. Commissioner, supra. This is particularly true in the case of related parties since formal debt paraphernalia of this type in a closeknit family are not necessary to insure repayment as the case may be between unrelated entities. Id. at 377-378.

2. Interest on the Transfers.

Neither the transfer on August 6, 1989, nor the transfer on September 25, 1989, was to bear interest. While it is true that neither transfer was subject to interest, we do not consider the absence of interest to be a significant factor in this case. Holland's will provided that all encroachments and distributions of trust corpus were to be interest free; thus, Jack as cotrustee was not empowered to charge decedent interest on the transfers.

3. Security or Collateral for the Transfers.

Decedent owned a one-half undivided interest as a tenant-in-common with her sister in a new condominium which they bought in 1988. Decedent gave a mortgage on the condominium to First National to secure a loan for $350,000, and Jack transferred the $100,000 at issue to her so that she could pay for improvements to it. Although the improvements were completed prior to her death, petitioner and respondent agreed that the fair market value of decedent's interest in the condominium at her death was only $300,000. Therefore, the condominium could not have secured her debt with First National and also the $100,000 transfer from the trust.

Furthermore, decedent's prior loans to First National, which totaled $600,000, were paid from her share of the proceeds from the sale of the entire Weinstock property. Thus, except for some cash remaining from her share of the proceeds from that sale, and some stocks and bonds, decedent had no other assets to use as

collateral for the transfers.  None of these assets, however, were pledged as security or collateral for the transfers. Indeed, there is no evidence that either of the cotrustees ever even asked decedent to secure or collateralize the transfers.

4.  Fixed Maturity Date for Repayment.

There was no fixed date for repayment of the transfers. Jack testified that he intended to transfer money from the Special Dividend Account to the JKH Trust as the funds came in and became available.  However, there is no evidence that decedent was aware of Jack's intention, or that she intended to repay the transfers.

5.  Demand for Repayment of the Transfers.

Consistent with the preceding factor, no demand for payment was made by either of the cotrustees.

6.  Actual Repayments.

Except for the payment on December 18, 1989, which was made after the death of decedent, no payments were made with respect to these transfers.  Neither decedent nor her agent made payments to the JKH Trust for either of these transfers while she was alive.

7.  Decedent's Ability to Repay.

Jack testified that he expected decedent to receive an income tax refund of $60,000, and that he intended to apply it to repayment of the transfers.  He expected the balance of the transfers to be repaid with the income from the stocks and bonds

owned by decedent. However, the record does not establish that decedent's income was sufficient to cover all of her personal living expenses, and her obligations to First National, and her other expenses, and also to permit her to accumulate sufficient assets to repay the $100,000 transferred to her. Rather, the regular and continuous borrowing of decedent is an indication that her annual income was not sufficient to allow her to maintain her lifestyle and repay her obligations.

Notwithstanding decedent's insufficient income as a source of repayment, the record shows that decedent owned sufficient assets to repay the transfers. There is no indication in the record, however, that the cotrustees would or could have required decedent to sell or mortgage those assets for that purpose.

On the record before us, petitioner has failed to establish that, at the times in 1989 when Jack, as cotrustee of the JKH Trust, transferred $50,000 (total $100,000) to decedent, he reasonably believed that she would be able to repay those amounts on demand.

8. Records of the Transfers as a Loan.

The only records relating to the transfers at issue that indicate the transfers were loans is the one word notation, "Loan", that Jack made on each of the checks. Furthermore, as Jack deposited the checks into the Special Dividend Account without her endorsement, there is no evidence that decedent ever

saw or was otherwise aware that the checks had the word "Loan" written on them.

Finally, it was only after respondent determined the gross estate should not be reduced for the $50,000 actually paid to the JKH Trust that the executors realized there were two transfers of $50,000 to decedent.  This is persuasive evidence that neither the trustees of the JKH Trust nor decedent's agent ever recorded the transfers as loans.

9.  Reporting the Transactions for Federal Tax Consistent with a Loan.

Petitioner reduced the value of the gross estate for the $50,000 actually paid by the executors to the JKH Trust, and for the $50,000 claimed as a debt owed by decedent.  However, it was only after respondent determined that the gross estate was improperly reduced for the $50,000 actually paid to the JKH Trust that petitioner amended its petition to include the second transfer of $50,000 as a debt of decedent.

Based on our examination of the entire record, we find that petitioner has not established that decedent entered into a bona fide creditor-debtor relationship with the JKH Trust at the time of the transfers at issue.  We find that petitioner has failed to satisfy its burden of proving that the transfers at issue constituted loans or that decedent knew or had any notice that the amounts she received from the JKH Trust were subject to repayment.  See Estate of Caplan v. Commissioner, 42 T.C. 446,

454 (1964) (Court upheld disallowance of section 2053 deduction for amount allegedly owed by deceased taxpayer to deceased spouse's estate; no evidence of an express or implied promise to repay; no proof that deceased taxpayer knew the amounts drawn by trustee for her benefit on Special Account were not her own), affd. sub nom. Levin v. Commissioner, 355 F.2d 987 (5th Cir. 1966). We therefore sustain respondent's determinations in this issue.

Issue 5. Whether the Present Value of the Cost of Maid Service for 5 Years May Be Deducted From the Value of the Estate as an Administration Expense

At the time of her death, decedent owned an undivided one-half interest in a condominium as a tenant-in-common with Mrs. Nathan. The executors have not distributed decedent's interest in the condominium, nor have they offered decedent's interest in the condominium for sale, and out-of-town guests stay there from time to time.

Decedent and Mrs. Nathan each employed maids; decedent had employed her maid, Mary, for 15 years prior to her death. Mrs. Nathan continues to occupy the condominium and continues to employ her own maid. The executors now employ Mary to clean and wax decedent's furniture remaining in the condominium "just so that it [doesn't] crack", and to do "whatever [is] needed to maintain the property."

Petitioner deducted the present value amount of 5 years of Mary's future services, $20,501, from the gross value of the

estate as an administration expense.[19]  Petitioner reported this
expense on Schedule L of Form 706 as an expense incurred for the
"Maintenance, insurance, upkeep and cleaning of condominium at
[address]".[20]

Respondent determined that the value of the gross estate
should not be reduced for this amount because the expenses of
maintaining the condominium are the responsibility of the
surviving co-owner and the beneficiaries of decedent's estate and
as such are not required for the administration of it.

Petitioner asserts that an administration expense of $5,000
per year for preserving and maintaining an interest in property
valued at $300,000 is reasonable, and that the 5 years estimated
to distribute the property is not a protracted period of
administration under the particular circumstances.

Section 2053(a)(2) provides that administration expenses
shall be deducted from the value of the gross estate if they are
allowable by the laws of the jurisdiction under which the estate
is being administered.  Section 20.2053-3(a), Estate Tax Regs.,
provides as follows:

> The amounts deductible from a decedent's gross estate as
> "administration expenses" * * * are limited to such expenses
> as are actually and necessarily incurred in the
> administration of the decedent's estate; that is, in the

---

[19]   The executors discounted at 7 percent five 50-week
years of $100 per week payments.

[20]   See supra note 2.

> collection of assets, payment of debts, and distribution of property to the persons entitled to it. * * *.  Expenditures

> not essential to the proper settlement of the estate, but incurred for the individual benefit of the heirs, legatees, or devisees, may not be taken as deductions.  Administration expenses include * * * miscellaneous expenses. * * *

Thus, for the expense to be deductible, the regulations require that in addition to the expense's being allowable under the state law under which the estate is being administered, it must also be "necessarily incurred" in the administration of the decedent's estate.

The Federal Courts of Appeals are split over whether this additional requirement is consistent with the statutory directive to follow State law.  See Estate of Papson v. Commissioner, 73 T.C. 290, 299 n.9 (1979), and the authorities cited therein.  In Marcus v. DeWitt, 704 F.2d 1227, 1229-1230 (11th Cir. 1983), the Court of Appeals for the Eleventh Circuit, the court to which an appeal in this case would lie, citing Pitner v. United States, 388 F.2d 651, 659 (5th Cir. 1967),[21] stated that the law is well established for the Eleventh Circuit that the State probate court determination is not conclusive of whether an administration expense is allowable for purposes of the Federal estate tax deduction.  Accordingly, in resolving this issue, we shall

---

[21]     See supra note 11.

consider whether the expense was "necessarily incurred" as required under respondent's regulations.

Section 20.2053-3(d)(1), Estate Tax Regs., provides:

Expenses necessarily incurred in preserving and distributing the estate are deductible, including the cost of storing or maintaining property of the estate, if it is impossible to effect immediate distribution to the beneficiaries. Expenses for preserving and caring for the property * * * may not be allowed for a longer period than the executor is reasonably required to retain the property.

Therefore, in resolving the issue of whether the estimated expense of maid service for 5 years is deductible from the value of the gross estate we must find: (1) It is impossible to effect immediate distribution of decedent's interest in the condominium to the beneficiaries, and (2) the expense is necessarily incurred in preserving the estate prior to distribution of property to the persons entitled to it and not incurred for the individual benefit of the heirs, legatees, or devisees.

At the time of trial of this case, decedent had been dead for more than 5 years, and the executors of her estate had not yet distributed her interest in the condominium to the beneficiaries. Despite the extended length of time, petitioner offered no evidence of any impediment to the distribution or sale of the property that would explain the delay. Furthermore, Jack testified that decedent's interest in the condominium was never offered for sale.

In arriving at the amount petitioner deducted for administration expenses, Jack consulted with his accountants for an estimate of the expense of maintaining the condominium. He testified that the accountants advised him that it would require approximately 5 years to determine the actual maintenance expense. Although Jack testified how he arrived at the estimate of the expense, he offered no persuasive evidence of why at the time they filed the estate tax return the executors thought it would require 5 years to dispose of the property, or of why the distribution of the property has yet to take place. The fact that petitioner deducted 5 years of estimated expenses for maid service without the executors' seeking information as to how long it would take to either distribute or sell the property, and that the executors actually never offered the property for sale, is evidence that the executors did not intend to distribute the property.

Therefore, we cannot find that petitioner has met its burden of proving that an immediate distribution of decedent's interest in the condominium was impossible to effect.

Jack testified that Mrs. Nathan continues to live in the condominium, and that out-of-town guests stay at the condominium from time to time. Furthermore, although the deducted expenses are for the maintenance of the condominium, Jack testified that the maid's duties, which were coordinated by Mrs. Nathan with her own maid's duties, were to clean and wax decedent's furniture

remaining in the condominium "just so that it didn't crack", and to do "whatever was needed to maintain the property."

On the Form 706, petitioner declared that the fair market value of decedent's furniture and other personal property at the date of her death was $18,330.[22] Item Three of Decedent's will provided that "All my household furniture and furnishings, objects of art, silverware, jewelry, clothing, and other such personal effects * * * I give and bequeath to my children who survive me, to be divided as my Executor shall determine."

Therefore, petitioner has attempted to deduct the expense of preserving furniture that decedent bequeathed to her children. Petitioner offered no evidence of any impediment to the immediate distribution of decedent's furniture.

On the basis of the evidence presented, we find that a portion of the expense claimed as a deduction for the maintenance of the real property was actually for the maintenance of decedent's personal property bequeathed to her children. Thus, the claimed expense is not deductible, because it inures to the individual benefit of the heirs, legatees, or devisees.

---

[22] The following property, and its value, were listed on Schedule F of the Form 706: Bedroom furniture and decorations, $10,440; Living room furniture, $4,850; Decorations, $1,540; and Other personal property, $1,500. Petitioner conceded the value of the Other personal property was actually $15,000, and that reporting it at the lower value was the result of a typographical error.

Petitioner failed to present an allocation of the claimed deduction between the expense of maintaining personalty bequeathed to decedent's children, and the expense of maintaining the condominium.  Moreover, as the property is occupied by Mrs. Nathan and the out-of-town guests, the evidence does not support a finding that the portion of the expense allocable to the maintenance of the condominium, if any, does not inure to the benefit of the heirs, legatees, or devisees.  We find, therefore, that petitioner has failed to meet its burden of proving that any portion of the claimed deduction for the expense of a maid is for maintaining or preserving the condominium prior to its distribution.[23]

Issue 6.  Whether Petitioner is Subject to an Accuracy-Related Penalty under Section 6662

We have found that petitioner erroneously reduced the value of the gross estate for:  inter vivos gifts of $120,000 that were not completed prior to the death of decedent, nor deductible as claims against the estate; debts totaling $100,000 for which there was no evidence of indebtedness; and $20,501 as an expense for the maintenance of property prior to distribution that the

---

[23]     Respondent introduced a letter into evidence that Jack sent to the IRS in which he stated the $100 weekly payments were retirement payments to "Mother's housekeeper who had been with the family for over 15 years."  We have found that the claimed expense fails to meet the requirements of sec. 20.2053-3, Estate Tax Regs.  In so finding, we do not address the question of whether the claimed deduction was actually for the expense of employing the maid, or for paying her retirement income.

executors never intended to distribute, and which inured to the benefit of the heirs.

Respondent determined that petitioner is liable for the penalty for negligence or intentional disregard of the rules or regulations pursuant to section 6662. Petitioner asserts that it was neither negligent nor intentionally disregarded the rules or regulations.

Section 6662 provides for the imposition of a penalty equal to 20 percent of the portion of an underpayment which is attributable to negligence or disregard of the rules or regulations. Sec. 6662(a), (b)(1). For purposes of the section, the term "negligence" includes any failure to make a reasonable attempt to comply with the Internal Revenue laws, a failure to exercise ordinary and reasonable care in the preparation of a tax return, and a failure to keep adequate books and records or to substantiate items properly. Sec. 1.662-3(b)(1), Income Tax Regs. Negligence is defined as a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). The term "disregard" includes any careless, reckless, or intentional disregard of the rules or regulations. Sec. 6662(c).

Just as with respondent's determination of deficiency, his determination of negligence or intentional disregard of the rules or regulations is prima facie correct with the burden of proof to the contrary on petitioner. Neely v. Commissioner, supra.

Petitioner bears the burden of proving that respondent's determinations are erroneous. Rule 142(a).

We find that petitioner was negligent with respect to the positions it took on each of these items. Jack is an attorney whose practice includes estate planning and general tax services; therefore, he either knew or should have known that the claimed items are not allowable.

Section 6664(c) provides that no penalty shall be imposed under section 6662 with respect to any portion of an underpayment

if it is shown that there was a reasonable cause for such position and that the taxpayer acted in good faith with respect to such position.

Under section 1.6664-4(b)(1), Income Tax Regs., the most important factor in determining whether a taxpayer has acted with reasonable cause and good faith is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability. Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge, and education of the taxpayer. Id.

We have already found that the positions taken on the return filed by Jack, an experienced attorney in tax matters, have no support in fact or law. Nor can we find that the positions taken on the return are the result of an honest misunderstanding of fact or law that is reasonable in light of the experience, knowledge and education of the taxpayer. Thus, considering all the facts and circumstances, we do not find that petitioner acted with reasonable cause and in good faith.

Petitioner asserts in the alternative, that the accuracy-related penalty should not be imposed because it disclosed its positions on the return.

No penalty under section 6662(b)(1) may be imposed on any portion of an underpayment that is attributable to negligence if

the position taken is adequately disclosed,[24] the position is not "frivolous", and the taxpayer has adequate books and records and has substantiated items properly.  Sec. 1.6662-3(c), Income Tax Regs.  A "frivolous" position with respect to an item is one that is "patently improper".  Sec. 1.6662-3(b)(3), Income Tax Regs.

Respondent's regulations provide two types of disclosure under section 6662(b)(1):  Disclosure in statements attached to the return, sec. 1.6662-4(f)(1), Income Tax Regs., and disclosure on the return, sec. 1.6662-4(f)(2), Income Tax Regs.  Petitioner did not attach a statement to its return; therefore, we look to the disclosure on the return to decide whether disclosure was adequate.

The Commissioner may by annual revenue procedure (or otherwise) prescribe the circumstances under which disclosure of information on a return in accordance with applicable forms and instructions is adequate.[25]  Sec. 1.6662-4(f)(2), Income Tax

---

[24]    The Omnibus Budget Reconciliation Act of 1993 (the Act), Pub. L. 103-66, sec. 13251, 107 Stat. 531, made certain changes to the accuracy-related penalties in sec. 6662 for tax returns due (without regard to extensions) after Dec. 31, 1993.
One of the changes was that the penalty for negligence in sec. 6662(b)(1) may not be avoided by disclosure of a return position.  H. Conf. Rept. 103-66, at 668-669 (1993), 1993-3 C.B. 393, 546-547.  However, the changes to the penalties for negligence and disregard of the rules or regulations provided by the Act do not apply to returns (including qualified amended returns) filed on or before Mar. 14, 1994.  Sec. 1.6662-2(d)(2), Income Tax Regs.  Jack, as executor, filed this estate tax return on Feb. 18, 1991; thus, these changes are not applicable.

[25]    In deciding whether petitioner's disclosure was
(continued...)

Regs.  In Notice 90-20, 1990-1 C.B. 328, the Commissioner provided guidance on which taxpayers may rely with respect to the negligence portions of the accuracy-related penalty imposed under section 6662(b)(1).  According to the Notice, if the disclosure was made on the return, the return had to contain the caption "DISCLOSURE MADE UNDER SECTION 6662" at the top of the left corner of the return and the caption had to refer to the page or line number containing the disclosure.[26]  Id. at 329. Furthermore, the disclosure had to be full and substantive and be clearly identified as being made to avoid imposition of the accuracy-related penalty.  Id.

In addition to deciding whether petitioner's position on each of the erroneously reported items was adequately disclosed, we must also find that the position was not frivolous, and that petitioner had adequate books and records and substantiated items properly.

The Deduction for the $120,000 of Incomplete Gifts

We find that petitioner's position with respect to the deduction for $120,000 of incomplete inter vivos gifts was

---

[25](...continued)
adequate, we note that the provisions of sec. 1.6662-4(f)(2), Income Tax Regs., which permit disclosure in accordance with annual revenue procedures for purposes of the substantial understatement penalty, do not apply for purposes of the penalty for negligence or disregard of rules or regulations.  Sec. 1.6662-3(c)(2), Income Tax Regs.

[26]     Petitioner's Form 706 did not contain the required caption.  However, assuming noncompliance with the notice in this regard is not outcome determinative, we consider the substance of the disclosures.

totally lacking in merit. As a matter of State law the gifts were not completed prior to decedent's death. The issuance of new checks by the executors is indicative that the executors were aware that the original checks issued by decedent were not negotiable. Thus, petitioner's position essentially is that the gross value of the estate should be reduced for incomplete gifts; this position is patently improper.

Furthermore, petitioner's argument that the checks are a deduction from the gross value of the estate as a claim against the estate pursuant to section 2053(a)(3) is similarly flawed.

To save petitioner from a finding that its position is not patently improper, we would have to give credence to its argument that a promise to make a gift to one's children based on love and affection is a bargained-for exchange supported by adequate and full consideration in money or money's worth. This we will not do.

Moreover, Form 706 provides Schedule K for listing the debts of the decedent. The 12 $10,000 checks were not disclosed on Schedule K, or anywhere else on the Form 706, as debts owed by decedent. Thus, we do not find the checks were adequately disclosed as debts owed by decedent at the time of her death.

We hold, therefore, that petitioner is liable for the accuracy-related penalty on the portion of any understatement of tax required to be shown on the return with respect to its position on the reduction of the gross value of decedent's estate for the $120,000 of incomplete gifts.

The $100,000 Alleged-Debt Deduction

Petitioner deducted $100,000 from the gross value of the estate for alleged debts of decedent for which there was no evidence of indebtedness. Furthermore, the return disclosed a deduction for a debt of only $50,000. The disclosure exception, therefore, could apply to only $50,000 of alleged debt.

The disclosure exception does not apply where the taxpayer fails to keep adequate books and records or to substantiate items properly. Jack is a cotrustee of the JKH Trust and was the attorney and agent of decedent. He had a fiduciary duty to both parties, yet he maintained essentially no records. He was unable to present records of either decedent or the JKH Trust that would support petitioner's position that decedent entered into a bona fide creditor-debtor relationship with the JKH Trust at the time of the transfers at issue.

We hold, therefore, that petitioner is liable for the accuracy-related penalty for the portion of any understatement of the tax required to be shown on the return with respect to its position on the reduction of the gross value of decedent's estate for the $100,000 of alleged debt.

The Deduction for Maid Service

Petitioner deducted $20,501 as an administration expense for the maintenance of property prior to its distribution where the facts show that the expense inured to the benefit of the heirs and was not properly deductible as an expense of administration.

Petitioner claimed this expense on Schedule L of Form 706 as an expense incurred in administering property for the "Maintenance, insurance, upkeep and cleaning of condominium at [address]".[27]

The mere listing of the deduction on the Form 706 does not disclose the fact that the expense was based on the estimated present value of 5 years of payments to a maid whose duties, at least in part, included cleaning and waxing personalty bequeathed to Lewis, Betty, and Jack. Reporting a deduction for the expense of maintaining furniture and other personal property bequeathed to decedent's children as an expense of maintaining the condominium is misrepresentation, not disclosure.

We hold, therefore, that petitioner is liable for the accuracy-related penalty for the portion of any underpayment of the tax required to be shown on the return that is due to the deduction claimed for the expense of waxing and cleaning decedent's personal property.

Jack testified that the balance of the expense was for paying the maid to do "whatever was needed to maintain the property." Not disclosed on the return, however, was the amount of the expense allocated for this purpose, or that the executors did not intend to distribute the property or offer it for sale. The mere listing of this expense on the Form 706 is not a complete, full, and substantive disclosure. See Notice 90-20, 1990 1-C.B. at 329.

---

[27] See *supra* note 2.

We hold, therefore, that petitioner is liable for the accuracy-related penalty for the portion of any underpayment of the tax required to be shown on the return that is due to the deduction for the expense of maintaining the condominium.

To reflect the foregoing,

<u>Decision will be</u>

<u>entered under Rule 155</u>.